**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3184-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DALE EDWARDS,

     Defendant-Appellant.

_____

Argued October 2, 2024 – Decided November 12, 2024

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 22-07-0635.

Ashley Brooks, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ashley Brooks, of counsel and on the briefs).

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the brief).

PER CURIAM

Defendant, Dale Edwards, appeals from a February 3, 2023 order denying his motion to suppress his statements and derivative evidence obtained during a motor vehicle stop. We vacate and remand for further proceedings.

I.

We glean the facts and procedural history from the record. In the afternoon of April 16, 2022, Officer Steven Oliver (Officer Oliver) observed a motor vehicle make an illegal U-turn on Route 46 in South Hackensack, N.J. Officer Oliver "activate[d the] lights [on his patrol car] to perform [a] motor vehicle stop." The motor vehicle stopped in the parking lot of a nearby business. Officer Oliver exited his vehicle and approached the driver's side of the stopped motor vehicle. He activated his body worn camera (BWC) when he reached the driver's side door.[1]

Officer Oliver observed defendant, who was the driver, and a passenger, who was in the front passenger seat of the motor vehicle. The officer requested

_____

[1] Officer Oliver explained that when the BWC is turned on, "[t]he first [thirty] seconds of the video [does not] have audio." He stated he should have activated the BWC when he activated the patrol car's lights. Also, he admitted to muting the audio "throughout" the stop. He stated he deactivated the BWC's audio when he discussed things with other officers. He acknowledged he should have stated why he was deactivating the BWC before muting the audio.

defendant's driver's license, and the vehicle's registration and insurance card. Defendant produced "a Montana driver's license" and a "temporary registration for the motor vehicle," but no insurance card.

Officer Oliver observed: (1) "that [defendant] was extremely nervous, shaking"; (2) defendant avoided eye contact; and (3) when defendant and he made eye contact, defendant's "pupils were extremely constricted."

The officer explained that "[t]hrough [his] training and experience [extremely constricted pupils] usually [were] indicative of someone being under the influence or in possession of narcotics." Further, he indicated that he had been involved in arrests related to narcotics, including "people under the influence or using those substances."

Officer Oliver returned to his patrol car and "ran [defendant's] driver's license" through the records system. The officer learned that defendant had a "non-extraditable" warrant out of Montana.

Officer Oliver returned to the motor vehicle and "asked [defendant] to step out of the vehicle." When defendant did so, Officer Oliver again observed that defendant was "extremely nervous and shaking and his eyes were still extremely constricted."

A-3184-22

Officer Oliver asked if defendant wanted to tell him about the "trouble back home." Defendant explained "different choices[2]"—"drugs."

Officer Oliver asked defendant if he would consent to a search of the motor vehicle. Defendant advised "it's not my car," so he could not consent to the search. Officer Oliver gave defendant three options: (1) consent to a search of the motor vehicle; (2) he could "get a canine"; or (3) defendant "could just tell [him] where the drugs were in the car." "[U]ltimately, [defendant] just told [him] there were drugs in the car."[3]

In response to Officer Oliver's inquiry—do you want to show me where—defendant directed Officer Oliver to the driver's side compartment where the officer located "three plastic red containers." Two of the containers were empty and "[o]ne contained a crystal-like substance, suspected to be methamphetamine."

Officer Oliver questioned defendant about whether the drugs were his or the passenger's. Defendant initially indicated the drugs were "not mine" but then

---

[2] We use the words from the transcript of the suppression hearing. Our review of the BWC video reveals defendant stated, "stupid choices."

[3] The transcript of the suppression hearing indicates "(Inaudible)" for a number of defendant's responses to Officer Oliver's questions. However, where the parties recite the responses as depicted on the BWC footage, we do the same.

admitted the drugs were his. Officer Oliver also questioned defendant about the last time he used methamphetamine and defendant stated "last night." Officer Oliver placed defendant "under arrest for the methamphetamine." Defendant was searched, handcuffed, and placed in the back of Officer Oliver's patrol car.

Thereafter, the police searched defendant's motor vehicle and discovered: (1) "a New Hampshire driver's license with [defendant's] picture on it but with" a different name; (2) "a social security card" with the different name on it; and (3) a "loaded nine-millimeter handgun."

A grand jury returned a five-count indictment charging defendant with: (1) third-degree possession of methamphetamine, N.J.S.A. 2C:35-10a(1); (2) fourth-degree possession of a counterfeit New Hampshire Driver's License, N.J.S.A. 2C:21-2.1d; (3) second-degree possession of a handgun without first having a permit to carry same, N.J.S.A. 2C:39:5b(1); (4) fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3d; and (5) second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1).[4]

_____

[4] Officer Oliver also issued motor vehicle summonses to defendant for: (1) making an illegal U-turn, N.J.S.A. 39:4-125; (2) careless driving, N.J.S.A. 39:4-97; (3) obstructing the passage of other vehicles, N.J.S.A. 39:4-67; and (4) delaying traffic, N.J.S.A. 39:4-56.

Defendant moved to suppress his statements, verbal and nonverbal, made at the scene of the stop and the physical evidence seized thereafter. The motion judge held a suppression hearing. Officer Oliver was the only witness to testify at the hearing.

In an oral decision issued after the hearing, the judge found Officer Oliver was a credible witness. She noted "[h]e answered questions in a responsive manner" and "[t]here were no inconsistent responses." She "also f[ound] . . . his demeanor and affect were appropriate." In addition, she found Officer Oliver's "testimony and the facts to which he testified were supported by . . . the audio and video recording taken from" his BWC.

The motion judge found the "initial stop of [d]efendant's vehicle was permissible" because Officer Oliver "witnessed [d]efendant make an illegal U-turn." Thus, the judge concluded, Officer Oliver "had a reasonable and articulable suspicion that [d]efendant committed a traffic violation."

The judge noted that Miranda v. Arizona, 384 U.S. 436 (1966), requires that "when a [person] is subjected to a custodial interrogation they must be provided information regarding their rights, including their right to remain silent and their right to counsel." She also explained "[c]ustodial interrogation w[as] . . . defined by the Miranda [C]ourt as questioning initiated by law enforcement

officers after a person ha[d] been taken into custody or otherwise deprived of his freedom of action in any significant way."

However, the judge also noted "[t]he protections of Miranda . . . d[id] not apply when detention and questioning [we]re part of an investigatory procedure," citing State v. Timmendequas, 161 N.J. 515 (1999); and "the roadside questioning of a motorist [wa]s not transformed into a custodial interrogation that must be proceeded by Miranda warnings simply because a police officer['s] questioning [wa]s accusatory in nature or designed to elicit incriminating evidence," citing State v. Hickman, 335 N.J. Super. 623, 631 (App. Div. 2000).

In distinguishing between "a custodial interrogation" or an "investigatory procedure," the motion judge explained the court must "view[] objectively the totality of the circumstances, . . . includ[ing] . . . the length of a detention, the time and place of the questioning or interrogation, and the conduct of the police officers."

Considering the totality of the circumstances—as they related to Officer Oliver's questions and defendant's statements—the motion judge stated:

> Officer Oliver noticed [d]efendant appeared to have pinhole pupils, rambling speech, nervous behavior, trembling. Officer Oliver's questions to [d]efendant came about as a result of his reasonable suspicion that

7

. . . [d]efendant was under the influence of narcotics, thereby justifying a more intrusive line of questioning than may be warranted in an ordinary traffic stop.

Here the questions were being asked outside the car, both the officer and [defendant] were standing outside the vehicle. [I]t was daylight. It was a busy street with motorists going by and [a passenger] still seated in the passenger seat of the automobile and the entire exchange occurred in mere minutes.

None of these circumstances could have . . . overborne [d]efendant's will. This was not a situation where [defendant] was in custody and where <u>Miranda</u> would have been implicated. Rather, these were questions . . . as a result of suspicions raised regarding [defendant's] driving while under the influence and are appropriate in the context of an ordinary traffic stop.

Regarding the ownership of the drugs when Officer Oliver asked who the drugs belonged to . . . [d]efendant could have answered by attributing possession to no one, to anyone . . . citing <u>State v. Sessions</u>, 172 N.J. Super. 558 [(App. Div. 1980)].

Therefore, for those reasons [d]efendant's statements on the scene were voluntary, not obtained in violation of any rights and accordingly [we]re admissible.

As to the search of the motor vehicle and the seizure of the physical evidence, the motion judge determined the search "was not . . . based upon [defendant's] consent." Instead, the judge found that defendant—in response to Officer Oliver's three options for searching the motor vehicle—"told Officer

Oliver . . . that there were drugs in the car and showed him where the drugs were, thereby providing probable cause for [the] search of the automobile."

The judge explained, that "[o]nce there was probable cause" the matter "squarely f[e]ll[] under . . . the automobile exception to the warrant requirement," citing State v. Witt, 223 N.J. 409 (2015).  Therefore, the judge concluded "Officer Oliver's search of [d]efendant's vehicle did not violate . . . [d]efendant's rights to be free from unreasonable searches and seizures and accordingly the items seized from the vehicle [were] admissible at trial."

II.

On appeal, defendant argues:

POINT I.

THE POLICE PROLONGED THE DETENTION AND REQUESTED CONSENT TO SEARCH WITHOUT REASONABLE SUSPICION, REQUIRING SUPPRESSION.

POINT II

BECAUSE [DEFENDANT'S] CONFESSION WAS INVOLUNTARY, BOTH THE CONFESSION AND THE DERIVATIVE EVIDENCE SHOULD BE SUPPRESSED.

POINT III

SUPPRESSION OF [DEFENDANT'S] RESPONSES TO OLIVER'S QUESTIONS IS REQUIRED

BECAUSE [DEFENDANT] WAS IN CUSTODY WHEN THE POLICE QUESTIONED HIM WITHOUT FIRST ADVISING HIM OF HIS RIGHTS.

A. [Defendant] Was in Custody When the Police Told Him that They Would Get Drug Dogs Unless He Consented to a Search or Confessed and Therefore the Police Were Required to Advise Him of His Rights.

B. At the Latest, [Defendant] Was in Custody Once Oliver Obtained Probable Cause for an Arrest, Not Only After Police Formally Arrested Him.

POINT IV

IF THIS COURT DOES NOT ORDER SUPPRESSION OF ALL OF THE EVIDENCE, IT SHOULD REMAND FOR ANOTHER SUPPRESSION HEARING. (Not raised below).

III.

"Our scope of review in this matter is limited." State v. Ahmad, 246 N.J. 592, 609 (2021). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Our "deference to those findings [is] in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot

10

enjoy.'" Ibid. (quoting Elders, 192 N.J. at 244). "A trial court's legal conclusions, however, 'and the consequences that flow from established facts,' are reviewed de novo." Ibid. (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

IV.

Defendant does not challenge the lawful traffic stop, but contends that "[b]ecause the police unlawfully prolonged the detention and sought consent to search without reasonable suspicion of criminal activity . . . all of the evidence must be suppressed." We disagree.

"Article I, Paragraph 7 of the New Jersey Constitution and the Fourth Amendment of the United States Constitution guarantee that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" Witt, 223 N.J. at 421-22 (quoting N.J. Const. art. I, ¶ 7; U.S. Const. amend. IV).

"A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017). Therefore, "[i]n order to justify such a seizure, 'a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly

persons offense.'" Id. at 533 (quoting State v. Scriven, 226 N.J. 20, 33-34 (2016)).

"During an otherwise lawful traffic stop, a police officer may inquire 'into matters unrelated to the justification for the traffic stop.'" Ibid. (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009); and then citing State v. Dickey, 152 N.J. 468, 479 (1998) ("[T]he reasonableness of [a] detention is not limited to investigating the circumstances of the traffic stop.")). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Rodriguez v. United States, 575 U.S. 348, 355 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)) (alteration in original). Ordinarily, such inquiries—as happened here—include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Ibid. When, "as a result of the initial stop or further inquiries, 'the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Dunbar, 229 N.J. at 533 (quoting Dickey, 152 N.J. at 479-80) (alteration in original) (internal quotation marks omitted).

"An officer's ability to pursue incidental inquiries, however, is not without limitations." Ibid. "A lawful traffic stop can transform into an unlawful detention 'if its manner of execution unreasonably infringes' on constitutionally protected interests." Ibid. (quoting Caballes, 543 U.S. at 407). Therefore, "the incidental checks performed by a police officer may not be performed 'in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" Id. at 533-34 (quoting Rodriguez, 575 U.S. at 355; and then citing Dickey, 512 N.J. at 476-79 (noting that detention can become unlawful if longer than needed to diligently investigate suspicions)).

"In determining whether reasonable suspicion exists, a court must consider 'the totality of the circumstances -- the whole picture.'" State v. Nelson, 237 N.J. 540, 554 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). We must "not engage in a 'divide-and-conquer' analysis by looking at each fact in isolation." Id. at 555 (quoting District of Columbia v. Wesby, 583 U.S. 48, 61 (2018)). Therefore, "[t]he reasonable suspicion inquiry . . . considers the officers' background and training, and permits them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an

untrained person.'" Ibid. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).

Applying these legal principles, the totality of the circumstances: (1) Officer Oliver's observation that defendant's "pupils were extremely constricted"; (2) Officer Oliver's training and experience that informed him that someone with "extremely constricted pupils" was usually "under the influence or in possession of narcotics"; (3) defendant's extreme nervousness, shaking, and avoiding eye contact; and (4) defendant's outstanding warrant; provided Officer Oliver with reasonable suspicion to prolong the stop and to broaden his inquiry into his suspicions that defendant possessed or was under the influence of illegal drugs.

Given that Officer Oliver had reasonable suspicion regarding defendant's drug possession or use, his request that defendant consent to a search of the motor vehicle and the suggestion that he could bring a canine to sniff the motor vehicle were appropriate in these circumstances. See State v. Carty, 170 N.J. 632, 647 (2002) (consent searches of motor vehicles are justified based on "reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity."); see also Dunbar, 229 N.J. at 540 ("if an officer has articulable reasonable suspicion

14

independent from the reason for the traffic stop that a suspect possesses narcotics, the officer may continue a detention to administer a canine sniff.").

Therefore, under these circumstances, we conclude that no suppression of any evidence was required.

V.

Defendant contends that Officer Oliver had "no reasonable suspicion to prolong the" stop and therefore the officer's suggestions that: (1) defendant could consent to a search of the motor vehicle; (2) defendant could just tell the officer where the drugs were in the motor vehicle; or (3) the officer could get a canine to sniff the motor vehicle, "threaten[ed] . . . an unjustified course of conduct" and coerced defendant's admission—there were drugs in the motor vehicle—and therefore, the admission and all derivative evidence must be suppressed. We disagree.

"[T]he State shoulders the burden of proving beyond a reasonable doubt that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." State v. Hreha, 217 N.J. 368, 383 (2014). The reviewing court must "assess 'the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation.'" Ibid. (quoting State v. Galloway, 133 N.J. 631, 654 (1993)).

The New Jersey Supreme Court "has instructed that factors relevant to that analysis include 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved.'" Ibid. (quoting Galloway, 133 N.J. at 654).

The motion judge's findings that Officer Oliver and defendant were outside, in the daylight, along a busy street with motorists, and the entire exchange occurred in mere minutes, are sufficiently supported in the record and support the judge's conclusion that defendant's will was not overborne.

In addition, our review of the BWC video depicts a scene where: (1) only Officer Oliver and defendant were interacting; (2) Officer Oliver and defendant maintained a reasonable physical distance between one another; and (3) Officer Oliver's tone was calm and not aggressive or threatening. Our observations similarly convince us that defendant's admission was voluntary.

As stated above, Officer Oliver had a reasonable suspicion of defendant's illegal drug possession or being under the influence of illegal drugs. Therefore, the officer could extend the stop to satisfy his suspicions and could request consent to search defendant's motor vehicle or advise defendant a canine sniff could be conducted. Thus, Officer Oliver's actions did not "coerce [defendant]

16

to confess by engaging in and threatening to engage in an unjustified course of conduct."

Therefore, under these circumstances, we conclude that no suppression of any evidence was required.

VI.

Defendant contends "[t]he trial court erred in only suppressing the statements made after the police formally arrested" him. Instead, defendant argues, "[t]he trial court should have . . . suppressed [defendant's] responses to the questions asked earlier by [Officer] Oliver because the responses were obtained in violation of Miranda."

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)).

In Miranda, the United States Supreme Court held "if a person in custody is to be subjected to interrogation, he [or she] must first be" warned of certain rights. Miranda, 384 U.S. at 467-68. When "warnings were required but not given, the unwarned statements must be suppressed." Hubbard, 222 N.J. at 265.

"Nonverbal responses to questioning are treated in the same way as are verbal responses." State v. Mason, 164 N.J. Super. 1, 4 (App. Div. 1979) (citing State v. Simmons, 52 N.J. 538 (1968)). "The privilege against self[-]incrimination extends to all acts intended to be of a testimonial or communicative character, whether in verbal or other form." Ibid.

"By custodial interrogation, [the Court] means questioning initiated by law enforcement officers after a person ha[d] been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

"[P]ersons temporarily detained pursuant to [ordinary traffic stops] are not 'in custody' for the purposes of Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984). However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him [or her] 'in custody' for practical purposes, he [or she] will be entitled to the full panoply of protections prescribed by Miranda." Id. at 440.

"[C]ustody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." Hubbard, 222 N.J. at 266 (quoting State v. P.Z., 152 N.J. 86,

18                                                              A-3184-22

103 (1997)) (internal quotation marks omitted). "On the other hand, [i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated." Ibid. (quoting Timmendequas, 161 N.J. at 614-15) (internal quotation marks omitted).

"Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible." State v. Stott, 171 N.J. 343, 364 (2002). "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103. The circumstances are viewed from the perspective of "how a reasonable [person] in the suspect's position would have understood his [or her] situation." Hubbard, 222 N.J. at 267 (quoting Berkemer, 468 U.S. at 442).

"[T]he term 'interrogation' under Miranda, refers to express questioning and any words or actions by the police that they 'should know are reasonably likely to elicit an incriminating response from the suspect.'" Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Thus, in <u>Sessions</u>, we concluded defendant was not subject to interrogation when the officer's:

> question was spontaneous and open-ended, not asked in the context of an interrogation, and was not specifically directed to [defendant]. It was the only question that was asked and [defendant] was under no compulsion to answer. The single question asked was not an essential part of the investigation which led to [defendant's] arrest, nor was it one of a series of investigatory queries. It was not the type of question that centered blameworthiness on [defendant]. [Defendant] could have attributed possession to anyone, or no one, in answer to a question which was not even specifically directed to him.
>
> [<u>Sessions</u>, 172 N.J. Super. at 563.]

Under the circumstances presented in <u>Sessions</u>, we concluded defendant's statement was admissible despite the absence of the <u>Miranda</u> warning. <u>Ibid.</u>

Here, we are required to determine when defendant was subjected to custodial interrogation and thus entitled to <u>Miranda</u> warnings. Defendant argues he was in custody for <u>Miranda</u> purposes when Officer "Oliver made clear that he was not going to let [defendant] leave even after completing the tasks related to the motor vehicle stop." Defendant contends "the officer made clear that [he] was not free to leave . . . unless he consented to a search or confessed" and therefore, Officer Oliver "needed to read [him] his <u>Miranda</u> rights."

20

Alternatively, defendant argues he was in custody "after [Officer] Oliver obtained probable cause for an arrest." Defendant asserts that "[a]fter [he] indicated that there were in fact drugs in the car, the police had probable cause for an arrest and were required to read [defendant] his <u>Miranda</u> rights prior to asking him incriminating questions."

The State contends defendant was in custody for <u>Miranda</u> purposes "when Officer Oliver told defendant that he was going to be under arrest."

The motion judge concluded all of defendant's pre-arrest statements were admissible under <u>Sessions</u>. We are not convinced. Officer Oliver had a reasonable suspicion defendant was in possession of or under the influence of illegal drugs. Therefore, within a reasonable period, Officer Oliver had the authority to inquire without providing <u>Miranda</u> warnings. <u>Hubbard</u>, 222 N.J. at 266. Thus, when Officer Oliver inquired as to whether defendant possessed drugs defendant was not subject to custodial interrogation under <u>Miranda</u>. Consequently, his admission was not subject to suppression.[5]

However, once defendant admitted to possessing illegal drugs, "a reasonable police officer would have believed he [or she] . . . had probable cause

---

[5] The motion judge correctly determined defendant's admission provided probable cause and thus the search of the motor vehicle was justified under the automobile exception under <u>Witt</u>, 223 N.J. at 422.

to arrest defendant . . . and would not have permitted defendant to leave." State v. O'Neal, 190 N.J. 601, 616 (2007). "Similarly, a reasonable person in defendant's position . . . would not have believed that he was free to leave." Ibid. Therefore, after defendant admitted to possession of illegal drugs he was in custody, for purposes of Miranda, and Officer Oliver was required to administer the Miranda warnings to defendant.

Moreover, Officer Oliver's subsequent questions—whether defendant wanted to show him where the drugs were in the car; to whom the drugs belonged; where he got the drugs and the last time he did drugs—"targeted" defendant as a suspect. Hubbard, 222 N.J. at 266. The officer's questions were not "spontaneous and open-ended." Sessions, 172 N.J. Super. at 563. Instead, Officer Oliver's questions were "specifically directed to" defendant. Ibid. Therefore, the motion judge misapplied Sessions by failing to distinguish between Officer Oliver's questions before and after defendant admitted to possession of illegal drugs.

Thus, we conclude, defendant's post-admission responses should have been suppressed under Miranda.

Defendant argues we "should remand to the trial court for a new suppression hearing where the trial court should reconsider its findings, including credibility findings regarding [Officer] Oliver, after applying the rebuttable presumption created by [Officer] Oliver's failure to record [with] the BWC."

Under N.J.S.A. 40A:14-118.3(a), "every uniformed State, county, and municipal patrol law enforcement officer shall wear a [BWC] that electronically records audio and video while acting in the performance of the officer's official duties, except" in certain limited statutorily defined circumstances.

The statutory framework requires that:

> the video and audio recording functions of a [BWC] shall be activated whenever the officer is responding to a call for service or at the initiation of any other law enforcement or investigative encounter between an officer and a member of the public, in accordance with applicable guidelines or directives promulgated by the Attorney General . . . . The [BWC] shall remain activated until the encounter has fully concluded and the officer leaves the scene.
>
> [N.J.S.A. 40A:14-118.5(c)(1).]

However,

> [t]he video and audio recording functions of a [BWC] may be deactivated, consistent with directives or

guidelines promulgated by the Attorney General, . . . while the officer is participating in a discussion pertaining to criminal investigation strategy and planning, provided that the discussion is not conducted in the immediate presence of a civilian and further provided that the officer is not actively engaged in the collection of physical evidence.

[N.J.S.A. 40A:14-118.5(c)(2)(c).]

According to the New Jersey Attorney General's BWC policy, "[w]hen an officer de-activates a BWC pursuant to this Section, the officer shall narrate the circumstances of the de-activation (e.g., 'I am now turning off my BWC to discuss investigative strategy with my supervisor.')." Off. of the Att'y Gen., Body Worn Camera Policy § 6.5 (Rev. 2022) ("De-Activation During Criminal Investigation Strategy/Planning Discussions").

Under N.J.S.A. 40A:14-118.5(q)(2):

If a law enforcement officer . . . fails to adhere to the recording . . . requirements . . . or intentionally interferes with a [BWC]'s ability to accurately capture audio or video recordings:

. . . .

there shall be a rebuttable presumption that exculpatory evidence was destroyed or not captured in favor of a criminal defendant who reasonably asserts that exculpatory evidence was destroyed or not captured.

24

Officer Oliver admitted he did not timely activate his BWC and deactivated the audio on the BWC "throughout" the stop, without "narrat[ing] the circumstances of the deactivation."

Here, defendant argues, as did his motion counsel repeatedly during the hearing, that Officer Oliver's BWC failures diminished his credibility. However, the judge was aware of Officer Oliver's actions and admissions, and nonetheless, found him credible.

Moreover, defendant's attempts here to "reasonably assert[] that exculpatory evidence was destroyed or not captured," are unavailing. Defendant suggests, as did motion counsel, "the missing video and audio from the beginning of the stop could have revealed that [defendant] was stopped without reasonable suspicion of a motor vehicle violation." However, N.J.S.A. 40A:14-118.5(c)(1), required Officer Oliver to activate his BWC once he was "responding" to, not before or during, defendant's illegal U-turn. Therefore, it is unlikely the BWC would have recorded defendant's illegal U-turn.

In addition, defendant contends that the BWC "could have revealed . . . that the officers decided to prolong the detention [or] request consent to search without good (or based . . . on improper) reasons." However, this contention fails because it relies on conjecture, not a "reasonabl[e] assert[ion]

that exculpatory evidence was destroyed or not captured." N.J.S.A. 40A:14-118.5(q)(2). Therefore, defendant has failed to establish any grounds for a new suppression hearing.

For the reasons stated, we vacate the suppression order in part and remand for the court to suppress defendant's responses, verbal and non-verbal, after he admitted he possessed illegal drugs.

Vacated and remanded for proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3184-22